## David A. Billings *vs.* GTFM, LLC, & others.[1]

Suffolk. April 5, 2007. - June 6, 2007.

Present: Greaney, Ireland, Spina, Cowin, & Cordy, JJ.

*Corporation,* Derivative action, Stockholder's derivative suit. *Practice, Civil,* Standing, Discovery. *Fraud.*

A plaintiff's involuntary loss of his ownership interest in a limited liability company, resulting from the company's dissolution after the plaintiff had filed his complaint, deprived the plaintiff of standing to maintain derivative claims against the company, where the plaintiff neither pleaded fraud nor presented any evidence that might support a claim of fraud perpetrated to deprive him of standing, and where the plaintiff's submissions were insufficient to create a live factual dispute about the validity of the vote to dissolve the company; moreover, it was not anomalous to allow certain counterclaims to proceed against the plaintiff after the dismissal of his derivative claims. [289-296]

The plaintiff in a civil action against a limited liability company failed to demonstrate that the dismissal of his derivative claims against the company had any effect on pretrial discovery related to his direct claims against the company. [296-297]

Civil action commenced in the Superior Court Department on July 3, 2002.

A motion to dismiss certain derivative claims was heard by *Margot Botsford,* J., and other direct claims and counterclaims were tried before her.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Daniel K. Hampton* for the plaintiff.

*Mitchell H. Kaplan* (*Richard M. Harper, II,* with him) for the defendants.

Cordy, J. Following his ouster as president of GTFM, LLC

---

[1]GTFinancial, LLC; Genesis Venture Management, LLC; Genesis Venture Partners, LP; Genesis Venture Partners, LLC; Arthur Appel; Michael J. Hullinger; Daniel Magario; Jeffrey M. Diggins; Rashid Ashraf; John Blais; Joseph Vrabel; and BlaisCo, LLC.

(GTFM or company), the plaintiff, David A. Billings, filed a number of direct and derivative claims against his fellow members and managers of the company. Soon thereafter, completing a process which had begun before the action was initiated, the members of GTFM voted to sell the entirety of its assets and liabilities to a new entity and to dissolve GTFM. Billings, the founder and largest stakeholder in GTFM, had no interest in the successor entity. On the basis of GTFM's dissolution, the defendants moved to dismiss Billings's derivative claims for lack of standing. The motion was allowed, and the case proceeded to trial on the direct claims and counterclaims. All of the claims, some of which required a jury and some of which were equitable claims, were tried together. The jury verdicts and the findings of the trial judge on the equitable claims were substantially in favor of the defendants. We transferred Billings's appeal to this court on our own motion.

On appeal, Billings assigns error to the dismissal of his derivative claims. Loss of ownership interest generally deprives a party of standing to pursue derivative claims on behalf of a corporate entity. Billings argues, however, that because he was deprived of his ownership interest in GTFM involuntarily, the dissolution of the company should not deprive him of standing to pursue derivative claims on its behalf. Given the circumstances presented here, we disagree. We are also unpersuaded by Billings's subsidiary attack on pretrial discovery. Accordingly, we affirm.

1. *Background.* We recount the facts as found by the judge. Billings, along with others, formed GTFM as a limited liability company[2] (LLC) in June, 1998.[3] GTFM's business focused on providing consulting services to troubled businesses, in particular by offering turnaround plans and management assistance. These services were principally provided to businesses in which the defendant John Blais had an interest. Bill-

---

[2]For a thorough discussion of the limited liability company entity, and of the Massachusetts Limited Liability Company Act, see Bishop, Unincorporated Limited Liability Business Organizations: Limited Liability Companies and Partnerships, 29 Suffolk U. L. Rev. 985 (1995).

[3]In addition to Billings, the initial members of GTFM were Richard Thomley, Jeffrey Troderman, the defendant Arthur Appel, the defendant John Blais, Edward Stewart, Elizabeth Stewart, and Jay LaMarche.

ings, who owned forty-six per cent of the member units of GTFM, was named president of the company. He was also an employee at will (as were all GTFM employees) at an annual salary of $195,000 plus expenses and a motor vehicle. There was no employment agreement.

The original members of GTFM apparently made initial capital contributions,[4] but did not make additional contributions thereafter despite the company's consistent annual losses.[5] All additional financial support for GTFM came from Blais in the form of investments and loans. In April, 2000, Blais loaned Billings $190,000, from which Billings then loaned GTFM $103,000. In October, 2000, Blais paid $500,000 for approximately twenty-six per cent of the GTFM membership units, which units had earlier been sold back to the company by a member who withdrew.[6] In the fall of 2001, at the request of Billings, Blais made a loan to GTFM in the amount of $1.35 million. These funds were intended to cover GTFM's operating expenses.

Through late 2001 and early 2002, concern about Billings's management style grew among the other members. Many of them — including Blais, the company's principal source of financing and of business — found Billings erratic and lacking

---

[4]Billings's scheduled initial capital contribution was $4,000. The judge's memorandum does not say whether this, or any other initial contribution, was actually made.

[5]GTFM's books reflect losses of $16,455 in 1998; $11,325 in 1999; and $200,000 in 2000. The loss for 2001 was even greater.

[6]Between the company's founding and October, 2001, several new members and member-managers were added. In that month, member-manager Jeffrey Troderman resigned. He signed a release of liability and surrendered his membership units. Troderman received payments totaling $37,000, of which $20,000 came from GTFM and the rest, nominally, from Billings. The agreement between Troderman and GTFM did not, however, state that he was receiving the $37,000 in payment for his units. The negotiations between Billings and Troderman were separate from those between Troderman and the company; and Billings obtained the $17,000 he gave to Troderman by taking a loan from the company. Billings later claimed that he was entitled to approximately forty-six per cent of Troderman's units. However, the GTFM operating agreement required that any transfer of units between members receive the written approval of a majority of disinterested managers. The judge found that Billings neither asked for nor received such approval, and accordingly, that Billings did not in fact own forty-six per cent of the Troderman units.

any coherent strategy to grow the company's business. They testified to specific examples supporting this view at trial, and the judge found that their conclusions about Billings were not made in bad faith.[7]

Eventually, several members of GTFM developed a reorganization plan for the company. It called for Billings to step down as president and take on the titles of founder and director of business development. The defendant Michael J. Hullinger was to become the new president. Billings's salary, benefits, equity position, and status as member-manager would be unchanged by the reorganization. Hullinger and the defendant Arthur Appel, also a member-manager, presented the plan to Billings at a dinner meeting on March 11, 2002. Billings left the dinner abruptly and thereafter never returned to work at GTFM.

The GTFM board had scheduled a vote on the reorganization plan for its meeting on March 21, 2002; however, this was postponed to accommodate Billings, who had gone to see Blais in Florida. When the meeting was held on March 25, 2002, Billings still did not attend, although he had returned from Florida. The managers of GTFM voted to adopt the reorganization plan.[8] The next month, Billings and his counsel met with Hullinger, Appel, and counsel for GTFM. They failed to reach a settlement or negotiate a buyout of Billings's interest in the company. Then, on May 23, 2002, the GTFM board of managers voted to terminate Billings's employment. He was not paid after that date.

The individual defendants (being all of the members of GTFM except Billings and Jay LaMarche) then formed a new company called Capital Risk Management, Inc. (CRM). On June 26, 2002, Hullinger gave notice to all members of GTFM of a special meeting to consider a sale of all the assets and liabilities of GTFM to CRM. The price set was the greater of $25,000 or the going concern value of the company as determined by an outside auditor. After the sale, GTFM would

---

[7]Billings contended at trial that the other members of GTFM had engaged in a variety of acts to freeze him out of his financial and managerial interest in the company. The judge found otherwise.

[8]At their meeting of March 25, 2002, the managers also apparently voted to place Billings on a paid leave for a limited period of time.

dissolve. The meeting was postponed to permit Billings to review corporate records. On July 18, 2002, a majority of the ownership units in GTFM voted to accept the plan of sale and dissolution.

The outside auditor used April 30, 2002, as the valuation date, because that was the point at which Billings had indicated his willingness to be bought out. Using the discounted cash flow method, the auditor determined that GTFM had a going concern value of approximately $1 million excluding debt. After accounting for the $1.35 million loan from Blais, GTFM had a negative value. Billings was therefore paid nothing for his interest.[9]

The same auditing firm that calculated the sale price also conducted an examination of Billings's expense reimbursements. It concluded that Billings had received reimbursements of at least $76,498 for expenses that were unrelated to the business. These monies were largely spent on personal travel and purchases. The judge concluded that Billings knew or should have known that these were not properly claimed business expenses.

The examination of Billings's claims for reimbursement also revealed several other irregularities. It came to light that Billings had only put $103,000 of the $190,000 loan from Blais (all of which was intended for GTFM) into GTFM, and had only done so three months after receiving the loan. Then, when Blais made the loan of $1.35 million to GTFM, Billings received a payment of $193,000 from GTFM to repay the $190,000 loan from Blais plus accrued interest. Billings then repaid the full amount to Blais. Thus, Billings repaid the $87,000 of the Blais loan proceeds that he had retained for himself by using company funds.

The auditor also discovered problems with GTFM's tax returns for 2000 and 2001. These returns had been signed and filed by Billings in his capacity as president of the company.[10] In those years, the company's Federal tax returns reported capital contribu-

---

[9]The record is unclear whether the payment of $25,000 due from CRM to GTFM was ever made, although that was to be the price payable if the auditor found (as it did) that the value of GTFM was less than that amount.

[10]The signature of a corporate official on a tax return document constitutes a representation that the contents of that return are true and accurate to the best of the signer's knowledge and belief.

tions from Billings of approximately $135,000 and $308,600. Billings, however, had made no such contributions. Based on the claimed contributions, Billings had allocated to himself GTFM losses of $134,620 for 2000 and $300,477 for 2001, thereby sheltering his personal income, including his salary from GTFM, from Federal taxation. The judge concluded that, in light of the fact that Billings had made no capital contributions in either year, he knew or should have known that the tax return misstated his contributions and improperly allocated GTFM's losses.

2. *Procedural history.* Billings commenced this action on July 3, 2002, by filing a verified complaint in the Superior Court. The first seven counts, denominated as derivative claims on behalf of GTFM, sought an equitable accounting of the company and alleged a breach of the LLC agreement by various members; conversion and breach of agreement by defendants John Blais and BlaisCo; and breach of the implied covenant of good faith and fair dealing by various members. The nine remaining direct claims asserted breach of the operating agreement, breach of the duties of loyalty and good faith, defamation, invasion of privacy, and intentional interference with advantageous economic relations against the various individual defendants. These counts further sought a judgment declaring that the other members had not acted in good faith in removing Billings, restitution, a constructive trust, and injunctive relief preventing the sale of GTFM's assets to CRM.

Billings filed his complaint after receiving notice of the members' meeting called to consider the sale of GTFM's assets (and subsequent distribution) but before the meeting actually took place. Along with his complaint, Billings also filed a motion for preliminary injunctive relief preventing the sale from going forward. That motion was denied after hearing on July 29, 2002, eleven days after the members of GTFM voted to proceed with the sale and dissolution. Billings never amended his complaint to assert that the vote and sale were carried out other than in accordance with the management agreement, or that the sale was otherwise defective.[11]

The defendants filed an answer on August 3, 2002. In addi-

---

[11]Billings's memorandum of law in opposition to the defendants' motion to dismiss his derivative claims did claim that the vote to dissolve GTFM was inadequate.

tion to a general denial of Billings's claims and assertion of affirmative defenses, they made counterclaims for conversion, breach of fiduciary duty, and unjust enrichment. These claims sought recovery in favor of GTFM rather than any individual plaintiff-in-counterclaim. The counterclaims also sought declaratory judgments concerning Billings's equity interest and capital account in the company and asserted a claim under G. L. c. 93A, § 11.

The judge entered a joint case management order on November 14, 2002. It provided for document discovery to end on February 17, 2003, with all depositions completed by May 30, 2003. Dispositive motions were to be filed and served by September 30, 2003, with a hearing on any such motions set for December 15, 2003. Trial was set for the following March. On July 29, 2003 — after the expiration of the discovery period — Billings moved to amend the case management order to extend the time to take party depositions. After a hearing with the parties, the judge allowed the modification.

As specified in the original case management order, the defendants served a motion (and supporting memorandum) to dismiss Billings's derivative claims for lack of subject matter jurisdiction on November 14, 2003. The judge allowed the motion on January 28, 2004. Trial on the remaining counts and counterclaim[12] commenced on June 21, 2004. After directing a verdict for the defendants on Billings's breach of contract claim, the judge submitted the intentional interference with advantageous economic relations claim to the jury and, by way of special questions, took advisory verdicts on the equitable claims.[13] The jury returned their verdicts on July 2, 2004. They found for the defendants on the intentional interference claim. They also rendered advisory verdicts in favor of the defendants on all equitable counts except one, finding that the individual defendants had breached their fiduciary duty to Billings by failing to provide fair value for his ownership interest in GTFM.

---

[12]Billings's counts for defamation and invasion of privacy had been dismissed by stipulation of the parties on March 26, 2003.

[13]The equitable claims tried were Billings's claims of breach of fiduciary duty against the defendants, as well as the defendants' counterclaims for breach of fiduciary duty and unjust enrichment.

The jury recommended damages of $100,000 on that count. On the counterclaims, the jury found for GTFM on both questions submitted to them. They concluded that Billings had breached his fiduciary duty to GTFM, but that this breach had caused no damage. They also concluded that Billings had, by taking improper reimbursements, unjustly enriched himself, causing damages of $90,000 to GTFM.

The judge entered her order on the equitable claims on January 17, 2005, by way of an extensive memorandum presenting her factual findings and legal conclusions. She found that the defendants' loss of confidence in Billings was reasonable and in good faith, and therefore that their decision to terminate his employment and to arrange for the sale of GTFM's assets to CRM (using the services of an outside auditor to determine price) did not constitute a breach of fiduciary duty. On the question whether the defendants had breached their fiduciary duty to Billings in not paying him fair value for his interest in GTFM, the judge concluded that, even if the defendants had breached their fiduciary duty in this regard, Billings had failed adequately to prove his damages. She found the analysis of Billings's valuation expert to be "flawed" and "unpersuasive." She noted that "the record does not appear to offer any persuasive evidence from which to determine a reasonable value figure." Accordingly, as the burden of proving damage was on Billings, he could recover nothing on this claim even if there had in fact been a breach of duty.[14]

The judge then turned to the counterclaims. She found that Billings had breached the duties of good faith and loyalty he owed to GTFM, specifically by (1) claiming and receiving reimbursement for claimed business expenses that were not legitimate; (2) allowing GTFM to repay the entire $190,000 loan from Blais even though he had only transferred $103,000 of that amount to GTFM; and (3) misrepresenting his capital contributions on the GTFM tax returns. The resulting damages were $87,000 based on the loan[15] and $76,498 for illegitimate

---

[14]In a footnote to her decision, the judge noted that the impossibility of proving the fair value would also hinder recovery through an equitable accounting.

[15]The judge noted that GTFM had also paid interest to Blais on this amount,

reimbursements, for a total of $163,498.[16] The judge concluded that this also constituted unjust enrichment, but dismissed the claim as duplicative of the damages ordered on the breach of fiduciary duty.[17]

In sum, the judgment was that Billings recover nothing, and that GTFM recover $163,498 from Billings, plus interest and costs. Billings appealed. On appeal, Billings argues that the dismissal of his derivative claims was improper. He also claims that the improper dismissal undermined discovery on his direct claims, entitling him to a new trial on all counts. We find no error.

3. *Standing to pursue derivative claims.* The defendants properly did not dispute Billings's standing to make derivative claims at the time he filed his complaint. The Limited Liability Company Act, inserted by St. 1995, c. 281, § 18, codified at G. L. c. 156C, provides for members of a limited liability company to bring suits on its behalf. G. L. c. 156C, § 56.[18] The procedural rule governing derivative actions by shareholders,

---

but did not include it in the damage award for want of proof of the proper amount.

[16]There was no claim for damages on account of the misrepresentations on GTFM's tax returns for 2000 and 2001.

[17]The judge also entered a declaratory order stating that Billings had never obtained ownership of any of Troderman's units and had not made any further capital contributions to GTFM entitling him to ownership of those units.

[18]General Laws c. 156C, § 56, provides in part: "Except as otherwise provided in a written operating agreement, suit on behalf of the limited liability company may be brought in the name of the limited company by:

> (*a*) any member or members of a limited liability company . . . who are authorized to sue by the vote of members who own more than fifty percent of the unreturned contributions to the limited liability company . . . provided, however, that in determining the vote so required, the vote of any member who has an interest in the outcome of the suit that is adverse to the interest of the limited liability company shall be excluded . . . ."

Here there was no provision in the operating agreement related to derivative suits. Nor was there evidence of any vote authorizing the suit. The defendants never asserted the lack of a vote as grounds for dismissal. Even if they had, the argument would likely have failed. As the derivative claims were against all other members of GTFM, all of them had "an interest in the outcome of the suit that is adverse to the interest of the limited liability company" (at least insofar as that interest was described in the complaint, taking the allegations made therein as true). Thus Billings would be the only member eligible

Mass. R. Civ. P. 23.1, 365 Mass. 768 (1974), requires that "the complaint shall be verified by oath and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains." These requirements were met. Billings's complaint also noted the futility of making demand on the other members that they authorize the company to proceed against them directly.[19]

Billings's standing did come into dispute once GTFM dissolved after the sale of its assets to CRM. At that point he no longer had any interest in GTFM because the company had dissolved. The defendants did not, however, move immediately after the sale to dismiss the derivative claims, instead waiting until the date specified in the case management order for dispositive motions. Both parties filed a memorandum of law on the question. The judge dismissed the claims in a margin order which read:

> "The motion to dismiss the plaintiff Billings's derivative claims is allowed. GTFM, LLC, is no longer in existence, and since that is the case, Billings does not have standing to bring these derivative claims. See *Lewis* v. *Anderson*, 477 A.2d 1040, 1047-1049 (Del. 1984). See also *Schaeffer* v. *Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C.*, 405 Mass. 506, 513 (1989) [(*Schaeffer*)]."

In *Schaeffer, supra* at 513, this court ordered the dismissal of a shareholder's derivative claim for want of standing after she had sold her stock in the company in whose right she proceeded.[20] *Schaffer* followed the rule in *Mendelsohn* v. *Leather Mfg. Corp*, 326 Mass. 226 (1950) (*Mendelsohn*), a much earlier

---

under the statute to vote on authorizing a suit against all other members for breach of fiduciary duty. He impliedly did so by filing the complaint.

[19]This satisfied the requirement in Mass. R. Civ. P. 23.1, 365 Mass. 768 (1974), that, "[t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort."

[20]In *Schaeffer* v. *Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C.*, 405 Mass. 506 (1989) (*Schaeffer*), a jury returned a verdict in the plaintiff's favor on her direct claims of violation of fiduciary duty. The judge had

case in which a former stockholder filed a bill in equity alleging that other stockholders had misappropriated corporate funds. The *Mendelsohn* court acknowledged that a derivative action was the proper remedy in such circumstances: "It is settled in this Commonwealth that the rights of a stockholder in such a situation are derivative and that his remedy must be through a minority stockholders' suit brought on behalf of the corporation." *Id.* at 237. The court first noted that the *Mendelsohn* plaintiff had not properly alleged a derivative (as opposed to a direct) action. It further refused to entertain the plaintiff's bill on account of "a more fundamental objection": "the fact that the plaintiff ceased to be a stockholder of [the company] and has shown no right in equity to be treated as such. . . . [H]is rights with respect to [the company] and the succeeding corporations have terminated." *Id.* Accordingly, his standing was lost.

Billings acknowledges that *Schaeffer* and *Mendelsohn* establish the general principle that a party who loses his interest in a corporate entity loses standing to pursue derivative claims,[21] but argues that these cases are readily distinguished from his own. The precedents, Billings notes, involve the voluntary sale of stock. In contrast, the divestiture of his stock was involuntary. He urges us to adopt a rule preserving the standing of a party to pursue derivative claims when his interest is lost involuntarily.

We have never squarely faced the question whether an involuntary divestment eliminates standing. Billings argues that depriving involuntarily divested shareholders of standing would frustrate the equitable purposes of derivative suits,[22] because when faced with a derivative suit alleging malfeasance against

---

entered judgment for the defendants notwithstanding the verdict. We affirmed the judgment, but on the ground of standing. *Id.* at 512-514.

[21]The requirement in rule 23.1 that the plaintiff be an owner "at the time of the transaction of which he complains" is the so-called "contemporaneous ownership requirement." There is no debate that Billings satisfied that requirement. The contemporaneous ownership requirement prevents purchase of stock simply to gain standing to press a derivative suit. In this case, as in *Schaeffer, supra,* a different standing requirement is at issue: the requirement that the plaintiff remain an owner during the pendency of his suit. It might be termed the "continuing ownership requirement" in order to distinguish it from the "contemporaneous ownership requirement."

[22]For a general discussion of shareholder derivative suits, see Clark,

them on the company's behalf, those in control could avoid answering the claims by a sale, merger, or reorganization, thereby depriving stakeholders (like Billings) of their ability to hold other stakeholders and managers (like the defendants) to account. In support of his argument against such a result, Billings relies on a phrase from *Mendelsohn* where the court noted that the plaintiff had not only "ceased to be a stockholder" but that he "[had] shown no right in equity to be treated as such," *Mendelsohn, supra* at 237; and argues that even if he lacks legal ownership, the involuntary nature of the divestment supports a continuing "right in equity" to be treated as an owner for purposes of standing.

This phrase from *Mendelsohn* is narrower than Billings would have it. In that case, the plaintiff argued that the sale of his stock was fraudulently induced by the defendants' withholding from him vital information on product development. *Id.* at 235-236. The "right in equity" to which the court referred was the plaintiff's right, had the court found fraud, to have the sale of his stock set aside and thus to reestablish his standing to sue as an owner. The *Mendelsohn* language does not support a right so broad as to encompass any situation involving involuntary loss of interest, including ordinary (nonfraudulent) sales and mergers. Rather, the case suggests that there must also be some misconduct such as fraud on the part of the defendants directly causing that loss of interest. With respect to the loss of his interest, Billings has not specifically or impliedly pleaded fraud or other misconduct.[23] Accordingly, we conclude that he has not proved (or even raised the possibility of) a "right in equity," as that phrase is used in *Mendelsohn*, to be treated as an owner for purposes of standing.

This result accords with the line of cases from Delaware cited by the trial judge, and which we find convincing. In *Lewis*

---

Corporate Law c. 15 (1986) (shareholders' suits).

[23]We do not consider Billings's general allegations of misconduct by violation of fiduciary duty to be sufficient on this point, because they do not relate specifically to the question of loss of ownership on the part of Billings, but rather to the alleged mismanagement on the part of the defendants. Similarly, Billings's challenge to the efficacy of the vote authorizing the sale of GTFM to CRM does not constitute a claim of fraud because it involves questions of corporate authority, not deception.

v. *Anderson*, 477 A.2d 1040 (1984), the Supreme Court of Delaware held that "[a] plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit."[24] *Id.* at 1049. It recognized only two exceptions to this rule: "(1) where the merger itself is the subject of a claim of fraud; and (2) where the merger is in reality a reorganization which does not affect [the] plaintiff's ownership of the business enterprise." *Id.* at 1046 n.10. The Delaware court reaffirmed this standing rule and the two exceptions in *Kramer* v. *Western Pac. Indus., Inc.*, 546 A.2d 348, 354-355 (Del. 1988).

More recently, in *Lewis* v. *Ward*, 852 A.2d 896 (Del. 2004), the Delaware court considered a claim remarkably similar to the one before us. The plaintiff in that case lost standing to pursue a derivative claim when the company in which she was a stockholder merged into another company. The other company became the sole shareholder in the original company, and the plaintiff received stock of the other company in exchange for her stock in the original company. *Id.* at 897. Having lost her standing to pursue claims on behalf of the original company, the plaintiff was given "leave to amend her complaint to allege facts that would bring her claims within the so-called 'fraud exception' to the general rule of *Lewis* v. *Anderson*." *Lewis* v. *Ward, supra* at 898. The amended claim was also dismissed, for failure to state "particularized facts invoking the fraud exception." *Id.* at 900. As the court explained, "a complaint seeking to invoke the fraud exception must demonstrate that the merger was fraudulent and done merely to eliminate derivative claims."[25] *Id.* at 905. The requirement that fraud must be pleaded with particularity is standard to notice pleading, and ap-

---

[24]Although *Lewis* v. *Anderson*, 477 A.2d 1040 (Del. 1984), was technically construing relevant provisions of Delaware's corporate law, see *id.* at 1049, we find its reasoning equally consonant with the relevant provisions of the Massachusetts Limited Liability Company Act, G. L. c. 156C, § 56, and Mass. R. Civ. P. 23.1.

[25]By its clear language, *Lewis* v. *Ward*, 852 A.2d 896, 905 (Del. 2004), requires that the fraud be perpetrated "merely to eliminate derivative claims." This is a higher bar than the one implied by the mention in *Mendelsohn* v. *Leather Mfg. Corp.*, 326 Mass. 226, 237 (1950), of the plaintiff's potential "right in equity to be treated as [a stockholder]." The *Mendelsohn* language suggests that a fraudulent loss of control would not defeat standing, even if

pears in our rules of civil procedure: "In all averments of fraud, . . . the circumstances constituting fraud , . . . shall be stated with particularity." Mass. R. Civ. P. 9 (b), 365 Mass. 751 (1974).

In this case Billings has neither pleaded fraud nor presented any evidence that might support a claim of a fraud perpetrated to deprive him of standing.[26] The defendants effected the merger of GTFM into CRM in order to solve a business problem, the need to remove Billings from both the management and ownership of their venture. The judge found that this was a rational business decision, taken in good faith based on legitimate concerns about Billings's performance. It was not a transaction fraudulently undertaken merely to deprive him of standing to pursue otherwise legitimate claims. Indeed, both the terms of the merger plan and notice of a scheduled vote of the members of GTFM were distributed before Billings commenced this action. Billings did not raise a claim of fraud in his memorandum of law opposing the motion to dismiss. Nor did he amend his complaint to allege that the transaction was fraudulent. He cannot now rely on the fraud exception to preserve his standing.

Billings makes two other points in support of his standing, neither of which is availing. First, he claims that the judge's dismissal of his derivative claims on summary judgment improperly presumed that the vote to dissolve GTFM was effective. Billings claims that the ownership of certain shares was in dispute, and therefore the validity of the vote presented a factual question that could not be resolved at the motion stage.[27] However, he provided no evidentiary support for this at summary judgment other than a claim made only "[o]n information and belief" in an affidavit (and repeated in a memorandum of law). In contrast, the defendants submitted letters of notice,

that fraud were not specifically aimed at eliminating derivative claims. In this case, there is no evidence of either type of fraud. Therefore the distinctions between *Lewis* v. *Ward*, *supra*, and the *Mendelsohn* case make no difference to our conclusions here, and we need not choose one formulation over the other.

[26]Billings makes no argument that the reorganization exception applies, which it plainly does not; we therefore only address the fraud exception.

[27]The dispute involved the shares owned by Jeffrey Troderman and by Edward and Elizabeth Stewart. If resolved in Billings's favor, it would reduce the number of member units voting in favor of the sale and dissolution below the required fifty per cent.

proxies, and meeting minutes, along with an affidavit of the new president of GTFM describing the process of the sale and the votes of the members. In the face of that, Billings's submissions were insufficient to create a live factual dispute about the validity of the vote to dissolve GTFM. "Supporting and opposing affidavits shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence . . . ." Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974). "All affidavits or portions thereof made on information and belief, as opposed to personal knowledge, are to be disregarded in considering a motion for summary judgment," because they constitute inadmissible hearsay. *Shapiro Equip. Corp.* v. *Morris & Son Constr. Corp.*, 369 Mass. 968, 968 (1976), citing *Automatic Radio Mfg. Co.* v. *Hazeltine Research, Inc.*, 339 U.S. 827, 831 (1950).

Billings also claims that dismissing his derivative claims against the defendants while allowing the defendants' derivative (as Billings terms them) counterclaims against him to proceed constitutes "two disparate results [that] cannot be justified." This misapprehends the nature of the counterclaims, and the form of the judgment entered against him. The various counterclaims for violation of fiduciary duty were stated not only by the individual defendants, but also by GTFM in its own capacity. See G. L. c. 156C, § 55 ("Suit may be brought by or against a limited liability company in its own name"). When GTFM sold all of its assets and liabilities to CRM, ownership of GTFM's direct claims against Billings passed by operation of law to CRM. G. L. c. 156C, § 62 (rights and liabilities after merger or consolidation vested in surviving entity). The counterclaims to which Billings points were therefore direct claims of GTFM against him, not derivative claims pursued by the individual defendants.[28] Thus, the judgment entered on those claims was in favor of GTFM only, and not in favor of any

---

[28]The judge noted in her memorandum and order, "[t]he defendants' breach of fiduciary claim was presented to the jury as being the claim of the individual defendants and of GTFM. However, on reflection it seems that the claims pursued by defendants were essentially claims of GTFM, not the individual defendants [whether direct or derivative], since at issue were funds that GTFM itself paid to Billings. It seems appropriate, therefore, to consider the breach of fiduciary claim as though it were brought only by GTFM."

individual defendant.[29] As these were direct claims of GTFM against Billings, it was not anomalous to allow them to proceed after Billings's derivative claims were dismissed.

In sum, because Billings has offered no equitable grounds on which to premise his standing to sue on behalf of GTFM, we hold that his loss of any ownership interest in GTFM, although involuntary, deprived him of standing to press derivative claims. These derivative claims were therefore properly dismissed.

4. *Discovery.* We now turn to Billings's objections to discovery. "While discovery orders are reviewable on appeal from entry of a final judgment, we do not interfere with the judge's exercise of discretion in the absence of a showing of prejudicial error resulting from an abuse of discretion." *Solimene v. B. Grauel & Co., KG,* 399 Mass. 790, 799 (1987). Billings does not argue that any particular discovery order was an abuse of discretion. Rather, he claims that the improper dismissal of his derivative claims, although not technically a discovery ruling, was effectively an abuse of discretion with respect to discovery on his direct claims because it prevented him from gaining information about, among other things, the financial operations of CRM.[30] As Billings puts it, the dismissal of his derivative claims "fundamentally changed the nature of discovery in the case going forward and distorted the trial of Billings's remaining claims." On those grounds, he asks that we order a new trial on all of his claims, derivative and direct.

As this argument depends on a premise we have rejected — namely, that the dismissal of Billings's claims was improper — it necessarily fails.[31] The substance of Billings's discovery argument also fails when set against the actual timing of events in this case. Under the modified case management order, all depositions (including experts) were to be completed by August 29, 2003. Even so, Billings was allowed to take further deposi-

---

[29]Because the judgment was in favor of GTFM on direct claims, we need not consider whether the individual defendants' counterclaims were properly characterized as direct or derivative.

[30]The defendants counter that Billings did have the information on the financial operations of CRM necessary to pursue his claims, and the record supports this.

[31]Billings does not offer an argument in the alternative premised on our concluding that the dismissal was proper.

tions after the deadline, suggesting that the judge in fact exercised her discretionary control over discovery in a manner accommodating to Billings. The motion to dismiss derivative claims was not filed until November 14, 2003; and it was not allowed until January 28, 2004, after all of the additional depositions taken by Billings were completed. In other words, discovery on all counts, derivative and direct, had ended before the derivative claims were dismissed. The dismissal of the derivative claims could not, therefore, have had any particular effect on discovery related to the direct claims.[32]

*Judgment affirmed.*

---

[32]Billings argues that the discovery limitations deprived him in particular of information necessary to prove the value of his interest in GTFM. Further discovery would, he claims, have allowed him to prove the damages, which the judge found had not been proved sufficiently. We think otherwise. The judge's conclusion that Billings had failed to prove his damages was based on her rejection of Billings's expert's valuation methodology, not the lack of information supporting his calculations.