Shant **KOLANCIAN**, derivatively on behalf of Boston Communications Group, Inc.,

v.

Edward H. **SNOWDEN**, Karen A. Walker, Paul J. Tobin, Frederick E. Von Mering, Brian E. Boyle, Gerald McGowan, Gerald Segal, James A. Dwyer, and Paul R. Gudonis, and Boston Communications Group, Inc.

**Civil Action No. 07–10351–RGS.**

United States District Court,
D. Massachusetts.

Jan. 25, 2008.

Benny C. Goodman, III, John K. Grant, Travis E. Downs, III, Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, Terence K. Ankner, The Law Offices of Partridge, Ankner & Horstmann, LLP, Boston, MA, for Shant Kolancian.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

STEARNS, District Judge.

This derivative suit arises out of allegations of the unlawful back-dating of options to purchase shares of defendant Boston Communications Group, Inc. (BCGI). Defendants, who include former officers and directors of BCGI, have moved to dismiss the action for lack of standing. Specifically, they contend that an August 30, 2007 short form merger between BCGI and Megasoft, Ltd. (Megasoft) extinguished any ownership interest held in BCGI by plaintiff Shant Kolancian.[1]

## DISCUSSION

■■■ Defendants' motion challenging Kolancian's standing is, in effect, a challenge to the court's jurisdiction properly raised under Fed.R.Civ.P. 12(b)(1).[2] As

1. Megasoft is a transnational telecommunications company incorporated and based in India.

2. As a court of limited jurisdiction, a district court has a duty to pay utmost attention to its jurisdictional authority. *See Sherman v. Cmty. Consol. Sch. Dist.*, 980 F.2d 437, 440 (7th Cir.1992) ("Nothing can justify adjudication of a suit in which ... there is some [] obstacle to justiciability.").

the court is permitted to look beyond the pleadings on a Rule 12(b)(1) motion, the formality of converting the motion to dismiss to one for summary judgment need not be observed. *Gonzalez v. United States,* 284 F.3d 281, 287 (1st Cir.2002); *Dynamic Image Techs., Inc. v. United States,* 221 F.3d 34, 37–38 (1st Cir.2000).

■ Fed.R.Civ.P. 23.1 and section 7.41 of the Massachusetts Business Corporation Act require that a derivative plaintiff be "a shareholder at the time of the act or omission complained of or became a shareholder through transfer by operation of law from one who was a shareholder at that time." *See* Mass. Gen. Laws, ch. 156D, § 7.41.[3] After the commencement of the action, and throughout the litigation, the plaintiff must continue to be a shareholder to ensure that he or she fairly and adequately represents the interest of the corporation. This "continuing ownership requirement," although not expressly stated in the statute, has been inferred from its language and appears to be settled as a matter of Massachusetts law. *Billings v. GTFM, LLC,* 449 Mass. 281, 291 n. 21, 867 N.E.2d 714 (2007).[4] *See also Schaeffer v. Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C.,* 405 Mass. 506, 513, 541 N.E.2d 997 (1989) (plaintiff loses standing to assert a derivative claim after she sells her stock in the company); *Mendelsohn v. Leather Mfg. Corp.,* 326 Mass. 226, 237, 93 N.E.2d 537 (1950) (plaintiff's right to bring a derivative suit terminates when he ceases to be a shareholder).

■ Prior to *Billings,* it was well established that a plaintiff who sold his interest in a corporate entity also divested himself of standing to pursue derivative claims. *See Schaeffer* and *Mendelsohn, supra.* The question squarely presented for the *Billings* Court was whether an involuntary transfer, that is, a cash-out merger, would similarly extinguish derivative standing. In holding that it did, the Supreme Judicial Court relied on a "convincing" line of Delaware cases holding that "[a] plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit." *Lewis v. Anderson,* 477 A.2d 1040, 1049 (Del.1984); *see also Lewis v. Ward,* 852 A.2d 896, 905 (Del.2004) (plaintiff lost standing when the company in which she was a stockholder merged into another company). A narrow exception to this rule arises "where the merger itself is the subject of a claim of fraud." *Anderson,* 477 A.2d at 1046 n. 10; *see also Billings,* 449 Mass. at 292, 867 N.E.2d 714.[5]

---

**3.** Rule 23.1 requires that a derivative complaint allege "that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law."

**4.** "The requirement in rule 23.1 that the plaintiff be an owner 'at the time of the transaction of which he complains' is the so-called 'contemporaneous ownership requirement.' ... The contemporaneous ownership requirement prevents purchase of stock simply to gain standing to press a derivative suit. In this case, a different standing requirement is at issue: the requirement that the plaintiff remain an owner during the pendency of his suit." *Id.*

**5.** The overall theory is not remarkable considering the general rule that "when one company purchases the assets of another, the purchaser does not thereby acquire the debts and liabilities of the seller." *McCarthy v. Litton Indus., Inc.,* 410 Mass. 15, 21, 570 N.E.2d 1008 (1991). The result is different where the transaction is a de facto merger, the mere continuation of the predecessor corporation, or a fraudulent effort to avoid liabilities. *Cargill, Inc. v. Beaver Coal & Oil, Inc.,* 424 Mass. 356, 359, 676 N.E.2d 815 (1997) (discussion of indicia of a de facto merger). *See also Scott v. NG US 1, Inc.,* 67 Mass.App.Ct. 474,

■ To establish that a merger was fraudulent, a plaintiff must plead with particularity that it was undertaken "merely to eliminate derivative claims." *Ward,* 852 A.2d at 905. *See also In re Mercury Interactive Corp.,* 487 F.Supp.2d 1132 (N.D.Cal.2007) (derivative suit based on alleged back-dating of stock options dismissed for lack of standing after cash-out merger because plaintiff could not show that the purpose of the merger was to avoid claims). In other words, the plaintiff must plead fraud not only on the part of the acquired corporation, *but also on the part of the surviving entity. See id.* at 1137. Here, Kolancian has not alleged any wrongdoing on the part of Megasoft. Indeed, Kolancian has not sought leave to amend the Complaint to add any allegations about the circumstances or even the fact of the merger. This failure alone is a sufficient ground to warrant dismissal of the Complaint.

Even that aside, Kolancian has offered nothing to show that the purpose of the merger with Megasoft was to frustrate this action. All indications are that the merger was undertaken for legitimate business reasons. BCGI was a Massachusetts corporation that specialized in developing products and services for the wireless communications industry. The company had faced a series of operating challenges beginning in May of 2005 when a federal court in this district held it and its co-defendants liable for a $165 million verdict in a patent infringement case. Immediately after injunctive relief entered in the patent case, BCGI's stock dropped 64 percent, from $4.81 per share to $1.75 per share. The company began looking for a buyer in October of 2005, and by early 2006, had approached nine potential suitors, four of whom expressed an interest in further discussions. Then,

in May of 2006, the Wall Street Journal published an article questioning the timing of certain stock options granted to defendant Edward Snowden, the company's Chief Executive Officer (CEO). In response, BCGI's Board of Directors created a Special Committee to conduct an independent review of the company's historical option granting practices. Compounding matters, the Securities and Exchange Commission (SEC) notified the company of a potential criminal investigation. By fall of 2006, the Special Committee had concluded that the company's financials would have to be restated. As a result, defendants Snowden, Chief Financial Officer Karen Walker, and Director Frederick Von Mering, left their positions in BCGI. In the interim, the company lost a number of key customers. On October 12, 2006, the Board decided to halt all efforts to sell the company until the internal investigation was complete.

This action was filed on February 22, 2007. The Complaint named nominal defendant BCGI, the company's principal officers, and the members of the 2006 Board of Directors. A few weeks later, BCGI announced financial restatements totaling some $13 million to correct accounting errors related to the stock option grants. The company, however, missed the April 2 deadline for filing its 2006 annual report with the SEC. As a result, it received a notice of noncompliance from the Nasdaq Stock Exchange. On April 19, 2007, defendants Brian Boyle and Paul Tobin met with Megasoft's CEO to discuss a potential buy-out. A few weeks later, on May 1, 2007, Megasoft made a non-binding offer to acquire BCGI. The parties also entered into an exclusivity agreement. The deal was finalized on August 30, 2007, after Megasoft completed a tender offer for

486–487, 854 N.E.2d 981 (2006) (citing *Cargill* ).

BCGI's outstanding common stock. The tender offer price of $3.60 per share represented a premium of 112 percent over the average closing share price for the 30 days prior to the announcement of the tender offer and a premium of 81 percent over the closing share price on the day immediately prior to the announcement. Over 88 percent of BCGI's issued and outstanding shares were tendered. The remaining stock was cancelled in exchange for a cash payment at the tender offer price. BCGI is now a wholly-owned subsidiary of Megasoft.

In Kolancian's view, this set of facts "clearly" shows that defendants "knew that the internal investigation of BCGI had uncovered numerous new accounting errors and other improprieties (including issues concerning the false pricing of stock options) that made it impossible for BCGI to file accurate financial reports." Kolancian leaps from this premise to the dubious conclusion that the defendants sought out the merger solely to avoid any personal liability for the back-dating. The "smoking gun" insofar as Kolancian is concerned, was the speed of the negotiations with Megasoft and the exclusivity agreement that precluded other suitors from tendering bids. Most objectionable to Kolancian, however, is that "by selling BCGI to a non-SEC reporting entity like Megasoft, the Board could bury its hopeless financial reporting problems in the new entity without ever having to disclose the true extent of the failed BCGI accounting systems and financial reports."

Kolancian's conjecture falls well short of a plausible claim for relief, *Bell Atl. Corp. v. Twombly*, —— U.S. ——, ——–——, 127 S.Ct. 1955, 1967–1969, 167 L.Ed.2d 929 (2007); *ACA Financial Guaranty Corp. v. Advest*, Inc., 512 F.3d 46, 57–58 (1st Cir. 2008); much less the particularized pleading standard of Fed.R.Civ.P. 9(b) ("A par-

ty must state with particularity the circumstances constituting fraud.").

### ORDER

For the foregoing reasons, the motion to dismiss is *ALLOWED.*

SO ORDERED.