NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1017

ADOPTION OF KARLOTTA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from a decree issued by a Juvenile Court judge finding him unfit and terminating his parental rights to his daughter, Karlotta.  We discern no reversible error in the exclusion of the father's witnesses as the father did not show any prejudice.  Further concluding that the trial judge properly found that the Department of Children and Families (DCF) made reasonable efforts to reunite the child with the father, we affirm.

1.  Background.  The father has a long history of mental health problems and has reported diagnoses of posttraumatic stress disorder, depression, anxiety, and bipolar disorder.  In 2016, the child's mother was killed, and the father seriously

_____

[1] A pseudonym.

injured, in a motor vehicle accident.  Starting in 2020, the father's mental health began deteriorating as he became fixated on his belief that his former fiancée's new boyfriend had molested the child.

In December 2020, the father ended his therapy, against DCF's recommendation.  In May 2021, the father engaged in erratic and threatening social media activity towards his former fiancée, her new boyfriend, the child's maternal grandmother, and DCF employees.  That same month, the father was arrested for violating restraining orders and briefly was committed to a hospital by the local police.  After his release the next day, he was again arrested for posting a threatening video and attempting to buy a firearm.

The child was placed in DCF's short-term assessment and rapid reintegration (STARR) program the following day after making suicidal statements and showing symptoms of trauma-reactive behavior.  The child participated in the STARR program from May to August 2021 and was placed in a specialized foster home upon her discharge from the program.

Following the child's removal in May 2021, the father was offered weekly, one-hour supervised visits.  The father consistently attended these visits and positively interacted with the child, leading to an increase in visitation in December

2

2021 to two-hour weekly visits.  In January 2022, DCF permitted unsupervised visitation.  The following month, while attending the child's therapy session, the father lost control of his emotions when the therapist discussed the child's anxiety and self-harming behavior.  In response, DCF suspended unsupervised visitation and, in March 2022, moved all future in-person visitation to DCF offices.

The father's cooperation with DCF precipitously declined during the spring and fall of 2022.  Although the father met with a therapist from May 2021 to May 2022, the therapist discharged the father when she determined that she could not help him reunite with the child.  The father declined DCF's referrals to two other counselling services and an anger management group after this discharge.  At that time, it had been at least one year since the father had taken his antidepressant medication.  In July 2022, the father posted DCF employee information and threats directed at his DCF social worker on social media.  The following month, the father posted about a planned public protest at a DCF office with the caption, "ITS HUNTING SEASON!!!" and, "I will make you pay."  As a result of these postings, the targeted DCF office closed on the day of the planned protest.

Starting in the spring of 2022, the child exhibited increased anxiety around visits with the father. After the Juvenile Court judge suspended visitation between August and October 2022, the child told a DCF social worker that the father "is going to scream and make threats until he sees me" and that his screaming made her feel unsafe. When in-person visitation with police present resumed in December 2022, the child required significant emotional support throughout visits. The child twice refused to attend visits in 2023, once telling the DCF social worker that she was scared to attend.

As the child's relationship with the father became increasingly strained throughout 2022, the child began to flourish academically and emotionally under her foster parents' care. The child developed a mutual bond with the foster parents and integrated well with the foster parents' family. In August 2022, DCF changed the child's goal from reunification to adoption. In the fall of 2022, the child expressed her preference to be adopted by her foster parents.

On December 1, 2023, the father was found unfit and his parental rights were terminated. This appeal followed.

2. Exclusion of the father's witnesses. "Trial judges have 'broad discretion to make discovery and evidentiary rulings,'" including the discretion "to exclude testimony of

4

witnesses whose use at trial is in bad faith or would unfairly prejudice an opposing party." Mattoon v. Pittsfield, 56 Mass. App. Ct. 124, 131 (2002), quoting Nally v. Volkswagen of Am., Inc., 405 Mass. 191, 197 (1989). In care and protection cases, the parties are required to file written witness lists by a set pretrial date, lists that are binding "except by court order for good cause shown." Rule 15(A) of the Rules of the Juvenile Court for the Care and Protection of Children (2018). We review evidentiary decisions of the trial judge for an abuse of discretion. See Adoption of Bea, 97 Mass. App. Ct. 416, 422 (2020). An abuse of discretion exists where the decision "amounts to a 'clear error of judgment' that falls 'outside the range of reasonable alternatives.'" Adoption of Talik, 92 Mass. App. Ct. 367, 375 (2017), quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). "[W]e do not interfere with the judge's exercise of discretion in the absence of a showing of prejudicial error resulting from an abuse of discretion." Billings v. GTFM, LLC, 449 Mass. 281, 296 (2007), quoting Solimene v. B. Grauel & Co., KG, 399 Mass. 790, 799 (1987).

Here, the parties all agreed to a September 1, 2023, deadline for filing witness lists, and the pretrial memorandum stated that the failure to comply with its stated provisions "shall be grounds for imposition of appropriate sanctions,

including evidentiary restrictions." Nonetheless, the father submitted his witness list on October 12, 2023, after the trial had begun (though before it had progressed much). At trial, DCF's and the child's counsel objected to the father's attempt to call his first witness. When asked to explain his late submission, the father's counsel offered only, "If I failed to comply with a deadline, that was through inadvertence." The trial judge accordingly sustained the objection, explaining that "you failed to comply with the pretrial order. You did not file a motion to expand time for filing. You did not file a motion asking for additional time on or before the due date. You did nothing other than file your pretrial memo." The trial judge further pointed out that the trial had begun by the time of the father's filing. In the father's subsequent motion to reconsider, the father likewise failed to explain either his late filing or provide a description of what his excluded witnesses would testify to.

Regardless whether this was an appropriate use of discretion where the witnesses in question were known to the other parties, the father has failed to make any showing that he was prejudiced by the absence of the witnesses. See Billings, 449 Mass. at 296. The father failed to make any offer of proof of what his proposed witnesses would testify to and how such

6

testimony would support his case.  See Letch v. Daniels, 401 Mass. 65, 70 (1987) ("purpose of an offer of proof is to show an appellate court that the proponent had been prejudiced by the exclusion of offered evidence").

The two witnesses cited by the father are his therapist and the court-appointed special advocate (CASA) supervisor.  In his motion for reconsideration, the father argued that his therapist should have been permitted to testify as her notes were previously admitted in evidence and the father would accordingly "wish to question her on the notes from the perspective of the Father and not just simply from the opposition's perspective." A review of the therapist's notes, however, reveals that they largely offer the father's perspective as the notes document his recounting of events in 2021 and 2022 with the therapist's corresponding reactions.  Indeed, the therapist clarified in her discussion with the guardian ad litem (GAL) that her basis of knowledge was limited to what the father told her.  The judge carefully considered the therapist's views and noted that the therapist "was unaware of many important aspects of Father's life."  The father has offered no support for the proposition that the therapist's live testimony would have provided anything helpful that was not already in the notes and other information in the record.

The father's other referenced witness, his CASA supervisor, presents even less apparent support for the father's case at trial. In his discussion with the GAL, the supervisor reported that the father was unable to move past either the child's removal in May 2021 or his belief that the child was sexually abused. The supervisor expressed further concern that the father would have future parental struggles given his anger management issues. Finally, the supervisor was aware of the father's negative treatment of DCF employees, including his suspicion that the father slashed DCF employees' vehicles' tires. Moreover, it was the supervisor who provided information that precipitated a Juvenile Court judge's sua sponte order in 2022 for the father to cease disseminating confidential information about the child, the pending case, and DCF employees' information online.[2] In sum, the father has failed to show prejudicial error.

3. Reasonable efforts. "The department is 'required to make reasonable efforts to strengthen and encourage the integrity of the family before proceeding with an action designed to sever family ties.'" Adoption of West, 97 Mass. App. Ct. 238, 241 (2020), quoting Adoption of Lenore, 55 Mass.

---

[2] We note that the sentiments the CASA supervisor expressed to the GAL matched those in the supervisor's reports, which were entered in evidence at trial without objection.

App. Ct. 275, 278 (2002). "A judge's determination that the department made reasonable efforts will not be reversed unless clearly erroneous." Adoption of West, supra at 242. "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Adoption of Larry, 434 Mass. 456, 462 (2001), quoting Custody of Eleanor, 414 Mass. 795, 799 (1993).

Here, the record at trial supported the judge's finding that DCF made reasonable efforts to reunite the father and the child. Indeed, the evidence showed that it was the father's general unwillingness to engage with or learn from the recommended services that ultimately prevented reunification. See Adoption of Gregory, 434 Mass. 117, 123 (2001), quoting Adoption of Paula, 420 Mass. 716, 730 (1995) ("The [father's] failure cannot be laid at the department's door"); Adoption of Eduardo, 57 Mass. App. Ct. 278, 282 (2003). After the father was discharged by a therapist in May 2022, he declined DCF's referrals to two different counselling services and did not reengage with a trauma therapist again until August 2023. The father similarly declined DCF's referral to an anger management group his social worker believed would help address his

9

inability to regulate his emotions.  In August 2023, the father completed a consultation with a trauma therapist but failed to follow any of the therapist's behavioral recommendations. Although the father testified that he accepted DCF's referral to a different trauma therapist and was close to finishing a class with the therapist, no evidence supported this claim.

Moreover, the evidence showed that DCF maintained consistent communication and scheduled visits with the father despite the father's increasing hostility towards DCF.  In fact, after the child's removal in May 2021, weekly visitation initially increased and temporarily became unsupervised in early 2022 before the father's angry outburst caused DCF to reduce visitation to weekly, one-hour supervised visits.  This visitation continued throughout 2022 despite the father's threatening social media posts directed at DCF, including a post targeting a specific DCF office with the caption, "ITS HUNTING SEASON!!!"  Accordingly, the record at trial supported the trial

judge's decision that DCF made reasonable efforts towards reunification.

Decree affirmed.

By the Court (Meade, Ditkoff & Hershfang, JJ.[3]),

_Paul Little_

Clerk

Entered:  July 11, 2025.

---

[3] The panelists are listed in order of seniority.