BRENT WILLIAMS, trustee,[1] & another[2] vs. JEAN BERNARD CHARLES & another.[3]

No. 12-P-1216.

Suffolk. April 4, 2013. - October 3, 2013.

Present: KANTROWITZ, BROWN, & KAFKER, JJ.

*Practice, Civil,* Dismissal, Standing. *Corporation,* Stockholder's derivative suit, Close corporation, Derivative action. *Fiduciary.*

Members of a Massachusetts limited liability company (company) had no standing under G. L. c. 156C, § 29, to bring derivative claims against the company's manager, where there was no evidence that the company's operating agreement had assigned a cash value to one member's noncash contribution to the company (for purposes of calculating the votes of members to authorize such a suit) as required by the statute [331-334]; further, even assuming that the allocation provisions set out in the operating agreement controlled for purposes of authorizing a derivative suit, the agreement still required assignment of a monetary value to that member's noncash contribution [334-335].

This court concluded that members of a limited liability company (company) could not exclude, based on familial relationship, a vote declining to authorize a derivative suit brought against the defendant manager of the company pursuant to G. L. c. 156C, § 56, that was cast by the manager's mother, where the members' allegations that the mother voted in alliance with her son and a nonfamily member at one meeting and failed to respond to the members' concerns were not particularized enough to demonstrate that the mother had significant contrary interests to those of the company in the outcome of a derivative suit. [335-338]

There was no merit to the assertions by members of a Massachusetts limited liability company (company) that certain claims brought by them against the company's manager were not derivative. [338]

This court dismissed as moot a freeze-out claim brought by members of a Massachusetts limited liability company (company) against the company's manager. [338-339]

CIVIL ACTION commenced in the Superior Court Department on January 28, 2008.

[1]Of Frowmica Nominee Trust, suing derivatively on behalf of Frowmica, LLC.

[2]Carlo Noel. Kareem Edwards was originally a plaintiff but is not a party to this appeal.

[3]Frowmica, LLC.

A pretrial motion to dismiss was heard by *Margaret R. Hinkle*, J., and the case was heard by *Douglas H. Wilkins*, J.

*Leonard M. Singer* for the plaintiffs.

*Richard C. Bardi* for the defendants.

BROWN, J. In this appeal, we consider whether the plaintiffs, members of a Massachusetts limited liability company, have standing to bring derivative claims on the company's behalf against the company's manager, as provided in the Massachusetts Limited Liability Company Act, G. L. c. 156C, § 56. Brent Williams, as trustee of Frowmica Nominee Trust, and Carlo Noel appeal from the dismissal of claims they brought on behalf of Frowmica, LLC (Frowmica), as stated in their second amended verified complaint (second amended complaint), against the defendants, Jean Bernard Charles and Frowmica. The issue of standing turns primarily on whether Williams's contribution to Frowmica, which was in the form of services rather than cash, should be included in calculating the votes of the members in favor of authorizing the derivative suit under the statute. We also consider whether the ownership interest of Charles's mother, Anna Charles, should be deemed adverse to interests of Frowmica, and her interest therefore excluded from the vote, because of her relationship with Charles. We affirm.

1. *Background.* We take the facts from the second amended complaint. Frowmica was organized as a limited liability company pursuant to G. L. c. 156C, and in accordance with the terms and conditions set out in the "Frowmica Limited Liability Company Operating Agreement" (operating agreement). The purpose of Frowmica was to own and operate a taxicab business. To that end, Diamond Universal Corporation (Diamond) set out to purchase the assets of Bay State Taxi LLC (Bay State), and formed Frowmica to negotiate and finance the purchase. Diamond raised capital for the transaction, with the understanding that it would reserve a 32.93 percent ownership interest in Frowmica for itself, which was subsequently reduced to 31.29, and would allocate the remainder among the other investors.[4] In May, 2007, the plaintiffs, along with the defendant Charles and other

---

[4] Diamond's interest was allocated to Williams, as trustee of Frowmica Nominee Trust. Diamond is the beneficiary of the trust.

investors, entered into the operating agreement, with Charles named as the managing member.

Attached to the operating agreement as Exhibit A is a document entitled "List of Members, Capital and Percentages." The relevant portions include the following:

| Member's Name | Initial Cash Capital Contribution | Percentages After Note Conversion | Note from Seller |
|---|---|---|---|
| Brent Williams | 0 | 31.29 | $700,000 |
| Carlo Noel | $50,000 | 5.71 | 0 |
| Gladys Hippolyte | $100,000 | 10.00 | 0 |
| Jean B. Charles | $385,000 | 38.00 | 0 |
| Anna Charles | $100,000 | 10.00 | 0 |
| Kareem Edwards | $65,000 | 5.00 | 0 |

The $700,000 note appearing alongside Williams's name was made payable to Bay State and was secured by Frowmica's membership interests. It was used toward the Bay State purchase price of $1.1 million.[5]

The plaintiffs claim that Charles has taken certain actions adverse to Frowmica. They allege, among other things, that Charles terminated the operations manager without cause, wrongly paid himself a salary and reimbursement for expenses without member authorization, hired unqualified friends and family members, and denied the plaintiffs access to financial and operational information. Charles refused to respond to the plaintiffs' repeated objections to those actions, and failed to provide an accounting upon the plaintiffs' request. The plaintiffs' plea to the other members, including Anna Charles and Gladys Hippolyte, was unavailing.

A meeting of the Frowmica members was held on June 7,

[5]The note conversion mentioned in the table refers to a $65,000 loan to Frowmica by Kareem Edwards, which was subsequently converted to a membership interest of five percent.

2008, to address the plaintiffs' concerns. Present were Charles, Anna Charles, Hippolyte, and Noel. At that meeting, Anna Charles and Hippolyte voted in alliance with Charles, agreeing to pay Charles approximately $78,000 in salary and to reimburse him several thousands of dollars for unsubstantiated expenses.

The plaintiffs filed a "First Amended Verified Derivative Complaint" (first amended complaint) against Charles and Frowmica, alleging on behalf of Frowmica claims for, among other things, breach of fiduciary duty, misappropriation, conversion, and freeze-out. A Superior Court judge dismissed the first amended complaint, without prejudice, for lack of standing to bring claims on Frowmica's behalf, and for lack of verification under oath. The plaintiffs then filed the second amended complaint, adding Anna Charles as a defendant. The derivative claims in the second amended complaint were dismissed, this time with prejudice, for untimely service of process upon Anna Charles and, again, for lack of standing. The plaintiffs' claim for an accounting was deemed a direct claim and was not dismissed. The accounting claim proceeded to trial in Superior Court, and judgment was entered for the plaintiffs, in part, ordering that certain information be provided to the plaintiffs and that an accounting be performed with respect to certain challenged transactions. The judgment dismissed the derivative claims pursuant to the previous order allowing the defendants' motion to dismiss.

2. *Standing based on contributions.* In reviewing the dismissal of the second amended complaint for lack of standing, "we accept the factual allegations in the plaintiffs' complaint, as well as any favorable inferences reasonably drawn from there, as true." *Ginther* v. *Commissioner of Ins.*, 427 Mass, 319, 322 (1998). We also may consider matters outside the face of the complaint, here the operating agreement and Exhibit A, which were relied upon by the judge. *Id.* at 322 n.6. See *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. 574, 577 n.2 (2002).[6]

Central to the parties' dispute is G. L. c. 156C, § 56, inserted by St. 1995, c. 281, § 18, which sets out the requirements that

---

[6]It is unclear from the record on appeal whether the operating agreement was attached to the second amended complaint, though its provisions are referenced throughout.

must be satisfied before a member of a limited liability company may bring a derivative claim on behalf of the company, and which states, in relevant part:

> "Except as otherwise provided in a written operating agreement, suit on behalf of the limited liability company may be brought in the name of the limited liability company by:

> "(a) any member or members of a limited liability company, whether or not the operating agreement vests management of the limited liability company in one or more managers, who are authorized to sue by the vote of members who own more than fifty percent of the unreturned contributions to the limited liability company determined in accordance with section twenty-nine; provided, however, that in determining the vote so required, the vote of any member who has an interest in the outcome of the suit that is adverse to the interest of the limited liability company shall be excluded."

The operating agreement in this case does not address authorization of members to bring suit on behalf of Frowmica. We therefore look to G. L. c. 156C, § 29, to explain the calculation of the percentages of members with unreturned contributions. Section 29, inserted by St. 1995, c. 281, § 18, provides:

> "(a) The profits and losses of a limited liability company shall be allocated among the members, and among classes or groups of members, in the manner provided in the operating agreement. If an operating agreement does not so provide, profits and losses shall be allocated on the basis of the agreed value as stated in the records of the limited liability company of the contributions of each member to the extent they have been received by the limited liability company and have not been returned.

> "(b) For purposes of this chapter, a member receives a return of his contribution to the extent that a distribution to him reduces his share of the fair value of the net assets of the limited liability company below the value, as set forth in the records required to be kept under this chapter, of his contribution which has not been distributed to him."

The reference to contributions in G. L. c. 156C, § 29, points us to the agreed values of the members' contributions as stated in Frowmica's records. Exhibit A to the operating agreement shows no agreed value next to Williams's name, as it does for the other members, and there is no indication that other Frowmica records contain an agreed value with respect to Williams's contribution.

Treating Williams's contribution to Frowmica as zero, the Superior Court judge determined that the plaintiffs, together, contributed only 42.5 percent of the total contributions. Because the plaintiffs failed to meet the statutory threshold of votes, by members owning more than fifty percent of the contributions in favor of authorizing the derivative suit, the judge dismissed the derivative claims of the second amended complaint for lack of standing.

On appeal, the plaintiffs maintain that Williams contributed services, rather than cash, by negotiating the asset purchase and raising the necessary funds. The plaintiffs correctly point out that neither the statute nor the operating agreement requires that only cash contributions made by Frowmica members are to be included in the determination of standing to bring a derivative claim. Indeed, contribution is defined in G. L. c. 156C, § 2, inserted by St. 1995, c. 281, § 18, as "any cash, or property, *services rendered* or a promissory note or other obligation to contribute cash, property or to perform services, which a person contributes to a limited liability company in his capacity as a member" (emphasis supplied). For purposes of standing, c. 156C, § 56, refers to § 29 to determine whether a member satisfies the requirement of owning more than fifty percent of the unreturned contributions in order to bring suit. Section 29, in turn, provides that profits and losses are to be allocated in accordance with the operating agreement or, if the operating agreement does not so provide, then "on the basis of the agreed value as stated in the records of the limited liability company of the contributions of each member." Therefore, unless the operating agreement provides otherwise, member contributions consisting of property and services, in addition to cash, are to be treated as contributions for purposes of standing.

Nevertheless, G. L. c. 156C, § 29, contemplates that an agreed

value be placed on noncash contributions, and that the value must be set out in the company's records. G. L. c. 156C, § 9(*a*)(5)(i).[7] Here, neither the operating agreement nor Exhibit A identifies an agreed value that the members assigned to Williams's contribution of services, and we are provided no other Frowmica records indicating as much.[8] Without an agreed value assigned to Williams's contribution, there is no basis for including his contribution in the member votes to authorize the derivative suit.

The plaintiffs argue that the agreed value of Williams's contribution of services is reflected in the 31.29 percent interest he received in Frowmica. But G. L. c. 156C, § 20(*c*), specifically states that a member may receive an interest in the company without making any contribution. We therefore do not infer that the percentage of Williams's share in Frowmica represented the agreed value of his noncash contribution, as Williams could have received that interest for no contribution at all.[9]

The plaintiffs additionally argue that article 4.2(a) of the operating agreement provides for the allocation of profits and losses in proportion to the members' percentages,[10] and in that respect, the operating agreement replaces § 29, regarding the manner in which allocations are made and, as such, the members' percentages should be used to determine standing under G. L.

---

[7]Section 9(*a*)(5)(i) requires a limited liability company to maintain, in the operating agreement or separate writing, "the amount of cash and a description and statement of agreed value of the other property or services contributed by each member and which each member has agreed to contribute."

[8]While we might infer, from the listing of the $700,000 note next to Williams's name on Exhibit A, that Williams played a role in arranging the financing for the asset purchase, the record indicates that the note itself was an obligation of Frowmica, and the plaintiffs do not contend that the value of the note represented a value for Williams's services.

[9]Similarly, in the corporate context, where services in connection with negotiating and promoting the company were to be treated as a capital contribution, the records of the company should make that clear. See, e.g., *Whaler Motor Inn, Inc.* v. *Parsons,* 3 Mass. App. Ct. 662, 674-675 (1975), *S.C.,* 372 Mass. 620 (1977). See also *Sher* v. *Malden Taxi, Inc.,* 4 Mass. App. Ct. 404, 408 (1976).

[10]Article 4.2(a), titled "Profit or Loss Other Than From a Capital Transaction," provides: "After giving effect to the special allocations set forth in Section 4.4, for any taxable year of the Company, Profit or Loss other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with the provisions of Section 4.3(a) and 4.3(b) shall be allocated to the members in proportion to their Percentages."

c. 156C, § 56. As we read § 56, however, standing to bring a derivative claim is expressly tied to the members' unreturned contributions, unless the operating agreement provides a different manner of determining standing. In other words, the reference in G. L. c. 156C, § 56, to § 29 is solely for the purpose of determining what constitutes an unreturned contribution.

But even assuming, without in any way deciding, that the allocation provisions set out in article 4 of the operating agreement, rather than G. L. c. 156C, § 29, control for purposes of authorizing suit as well as allocation of profit and losses, the plaintiffs have not persuaded us that the outcome would be different. To begin, determining allocations under article 4 is no simple matter, and distribution of profits and losses based on the members' percentages occurs only after giving effect to special allocations based on the members' respective capital contributions. Article 4.1 of the operating agreement defines capital contribution as "the total amount of cash and the fair market value of any other assets contributed . . . to the Company by a member, net of liabilities assumed or to which the assets are subject." To that end, article 4 of the operating agreement requires that a separate capital account be maintained for each member, reflecting the amount of cash contributions and the fair market value of any other assets contributed.[11] As a result, a determination of standing pursuant to the allocation provisions of the operating agreement would still require that a monetary value be assigned to Williams's noncash contribution.[12]

3. *Interest of Charles's mother.* The plaintiffs included Anna Charles as a defendant in their second amended complaint, presumably so that her vote would be excluded from the percentage needed to authorize the derivative suit and thereby provide the plaintiffs with enough votes for standing under G. L. c. 156C,

---

[11]The ordinary meaning of fair market value is "the price an owner willing but not under compulsion to sell ought to receive from one willing but not under a compulsion to buy." *Boston Gas Co.* v. *Assessors of Boston*, 458 Mass. 715, 717 (2011), quoting from *Boston Gas Co.* v. *Assessors of Boston*, 334 Mass. 549, 566 (1956).

[12]The fact that certain voting rights are based on the members' percentages rather than their contributions is similarly unavailing. The operating agreement requires a vote of seventy percent of the members' percentages to challenge the manager's performance; hence, we will not infer that a vote of a mere majority of those percentages is sufficient to bring a lawsuit against the manager.

§ 56. See, e.g., *Billings* v. *GTFM, LLC*, 449 Mass. 281, 289 n.18 (2007) (taking allegations of complaint as true, members named as defendants were deemed adverse and not eligible to vote on authorizing suit under § 56). Having failed to serve Anna Charles in a timely fashion, however, the plaintiffs seek to exclude Anna Charles from the vote based on her relationship with Charles. They allege that her interest, as Charles's mother, is aligned with him and is thus adverse to the interests of Frowmica in the outcome of the suit.

The plaintiffs rely on *418 Meadow St. Assocs., LLC* v. *Clean Air Partners, LLC*, 304 Conn. 820, 832 (2012), in which the Supreme Court of Connecticut, applying Connecticut law, held that the ownership interest of the defendant's wife was to be treated as adverse to the interests of the limited liability company, and therefore was to be excluded in determining whether the plaintiffs had standing to bring a derivative suit. The court reasoned that "[t]he law generally affords a different treatment to spouses than to other parties." *Ibid.* The plaintiffs urge that the same principle be applied, as well, to the parent of a member whose interest is adverse to the company's interest in the outcome of the suit.

We decline to extend the principles regarding the treatment of a spouse's interest to those of a parent, at least without more particularized allegations. Rule 23.1 of the Massachusetts Rules of Civil Procedure, 365 Mass. 768 (1974), requires that a plaintiff making a derivative claim allege with particularity the reasons for his failure to obtain the relief sought from the other members of the company. See *Kessler* v. *Sinclair*, 37 Mass. App. Ct. 573, 574 (1994). In *Billings* v. *GTFM, LLC*, 449 Mass. at 289-290 nn.18-19, the Supreme Judicial Court observed that the particularity requirement of Mass.R.Civ.P. 23.1 applied to allegations concerning standing to bring derivative claims under G. L. c. 156C, § 56. Accordingly, we require particularity in the allegations concerning the adverse interests of members sought to be excluded from the vote authorizing a derivative suit on behalf of a limited liability company. See *ibid.*

The particularity requirement applies to allegations concerning family members. In the corporate context, familial relationships were among the factors considered in determining whether

a director was interested or disinterested, for purposes of a presuit demand under Mass.R.Civ.P. 23.1. See *Harhen* v. *Brown,* 431 Mass. 838, 843 n.5 (2000). See also *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 523 (1997).[13] "The purpose of the distinction between interested and disinterested directors is to ensure that the directors voting on a plaintiff's demand can exercise their business judgment in the best interests of the corporation, free from significant contrary personal interests and apart from the domination and control of those who are alleged to have participated in the wrongdoing." *Harhen* v. *Brown, supra* at 843.

In that regard, *Danielewicz* v. *Arnold,* 137 Md. App. 601 (2001), is instructive. Applying Maryland corporate law,[14] the Court of Special Appeals of Maryland rejected the notion that the relationship between the defendant, a director accused of wrongdoing in a corporate transaction, and her son, also a director, was sufficient to show that the son was interested in the outcome of the lawsuit for purposes of rule 23.1. Citing the particularity requirement, and noting that the son was not named as a defendant, the court ruled that the allegations of the complaint failed to show that the son was "so personally and directly conflicted or committed" to the allegedly wrongful transaction carried out by his mother that he could not respond in good faith to the plaintiffs' demand to sue. *Id.* at 292, quoting from *Werbowsky* v. *Collomb,* 362 Md. 581, 620 (2001) (in turn citing *Harhen* v. *Brown, supra,* and requiring allegations that clearly demonstrated "in a very particular manner" that director was personally and directly conflicted or committed to decision in dispute). This was so even though the complaint alleged that the son stood to benefit from the challenged transaction.

For much the same reasons, in this context, we believe the

---

[13]The futility exception to making a presuit demand in derivative suits on behalf of a corporation was eliminated by G. L. c. 156D, § 7.42, inserted by St. 2003, c. 127, § 17, effective July 1, 1994, but the analysis is useful here. See, e.g., *Diamond* v. *Pappathanasi,* 78 Mass. App. Ct. 78, 89 n.15 (2010).

[14]We properly may consider principles of corporate law from other jurisdictions where the reasoning is "equally consonant with the relevant provisions of the Massachusetts Limited Liability Company Act, G. L. c. 156C, § 56, and Mass. R. Civ. P. 23.1." *Billings* v. *GTFM, LLC,* 449 Mass. at 293 n.24 (referencing standing under Delaware corporate law).

fact that Anna Charles is Charles's mother is insufficient to show that her interest is adverse to those of Frowmica regarding the outcome of the suit. We also think that the allegations that Anna Charles voted in alliance with Charles at one meeting, along with another member with no familial ties to Charles, and failed to respond to the plaintiffs' concerns, fell short of the particularized facts required to show that she had significant contrary personal interests to those of Frowmica regarding the lawsuit.[15] See generally *Harhen* v. *Brown*, 431 Mass. at 843. See also *Grossman* v. *Johnson*, 674 F.2d 115, 124 (1st Cir. 1982) (bare allegations of wrongful participation or acquiescence insufficient to show directors' conflict with corporate interest). Compare *Beam* v. *Stewart*, 833 A.2d 961, 981 (Del. Ch. 2003) (voting records could show whether directors typically went along with wishes of controlling shareholder).

4. *Derivative versus direct claims.* Despite styling their second amended complaint as derivative, the plaintiffs subsequently attempted to recast several of their derivative claims as direct. The defendants would hold the plaintiffs to their original characterization, but "[we] treat pleadings according to their nature and substance." *Jackson* v. *Stuhlfire*, 28 Mass. App. Ct. 924, 924-925 (1990), quoting from *Fabrizio* v. *U.S. Susuki Motor Corp.*, 362 Mass. 873, 873 (1972).

The plaintiffs argue, first, that their claims based on Charles's alleged breach of the operating agreement are contract-based and are enforceable by any party thereto, as provided in the operating agreement. They rely on general language in the operating agreement that it "is binding upon, and inures to the benefit of, the parties hereto," and affords any party the right to injunctive relief. Here, however, the recovery sought by the plaintiffs, arising from allegations of Charles's self-dealing and excessive compensation, belonged to Frowmica. See *Bessette* v. *Bessette*, 385 Mass. 806, 809-810 (1982); *Jackson* v. *Stuhlfire, supra* at 925 (mismanagement alleged by plaintiffs adversely affected them merely as owners of corporate stock).

The plaintiffs additionally argue that their claim of a minority

---

[15]The plaintiffs also included, with their opposition to the motion to dismiss, a letter written by Charles indicating that he contributed $100,000 in capital to Frowmica in his mother's name. The plaintiffs have not persuaded us that Anna Charles's interest should be imputed to Charles on that basis.

shareholder freeze-out by Charles should have been treated as a direct claim, in the same manner the judge treated their accounting claim. The freeze-out claim alleges that Charles denied the plaintiffs access to Frowmica's financial and operational information and had two of the plaintiffs removed from Frowmica's offices by police. A minority freeze-out claim need not be brought derivatively on behalf of the company, where the wrongs alleged were done to the individual plaintiffs. See, e.g., *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 842, 848-849 (1976) (loss of employment); *Schaeffer* v. *Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C.*, 405 Mass. 506, 507, 513-514 (1989) (failure to disclose facts material to plaintiff's interests and wrongfully withholding money due her).

We need not decide the issue, however, as we determine that the plaintiffs' freeze-out claim is moot. The sole remedy sought in connection with the freeze-out claim is a declaratory judgment that the plaintiffs represent a minority of Frowmica's member interests and that the defendants have frozen them out by denying them basic financial and operational information about Frowmica. The plaintiffs' claim for an accounting relied on the same allegations with regard to the lack of financial and operational information available to the plaintiffs. That claim was tried, extensive findings were made, and judgment was entered for the plaintiffs, in part, granting them relief in the form of access to certain company information and an accounting.

We are satisfied that the judgment entered on the plaintiffs' accounting claim afforded them the relief sought in their freeze-out claim, and no purpose would be served in remanding the matter for further proceedings, even were we to decide that the claim is direct. See *Ott* v. *Boston Edison Co.*, 413 Mass. 680, 682-684 (1992) (claim moot where shareholders already had attained, through another process, objective sought in claim for declaratory relief). Compare *Boulanger* v. *Dunkin' Donuts, Inc.*, 442 Mass. 635, 639 n.8 (2004) (claim not dismissed where money damages sought in addition to declaratory relief).

The judgment shall be amended with the notation that count seven, for minority freeze-out, is dismissed as moot. As so amended, the judgment is affirmed.

*So ordered.*