Salinger, Kenneth W., J.
Mirra Co., Inc., is a closely-held corporation. Leonard Mirra (known as Lenny) and his sister Sandra Capo are minority shareholders. Norino Mirra and his deceased brother Ralph Mirra together were the majority shareholders and ran the Company during the relevant period. Lenny and Sandra claim in Counts I to III of their second amended complaint that Norino (who is their grand uncle, because he was their father’s uncle) is liable to them personally for breach of fiduciary duty, breach of contract, and tortious interference with their advantageous relationships with the Company. Count IV seeks an accounting of all transactions between the Company and either Norino, Ralph, or entities they or their immediate family controlled.
The pending motions for summary judgment concern Plaintiffs’ other claims. CountV seeks a declaration that Norino’s transfers of new shares of Company stock to his children Christopher Mirra and Natalie Wright violated stock transfer restrictions that were agreed to by Norino and all other shareholders. The Court will DENY Chris and Natalie’s motion for summary judgment on this claim, and instead order declaratory relief in favor of Lenny and Sandra, because the shareholders’ Redemption Agreement barred the *42 challenged transfers. Count VI asserts a derivative claim on behalf of the Company alleging that Norino breached his fiduciary duties by usurping a corporate opportunity to develop the Longview apartments and by failing to pay the Company all it was reasonably owed for its work on and other contributions to the Longview project. The Court will ALLOW Norino’s motion for summary judgment on this claim because Plaintiffs lack standing to assert it. Lenny and Sandra do not meet the statutory requirement that derivative claims may only be asserted on behalf of a corporation by someone who owned company stock at the time of the alleged wrongdoing. The undisputed facts show that Norino’s alleged breaches of fiduciary duty to the Company all took place before Lenny and Sandra acquired their Company stock. There is no evidence that Norino engaged in any continuing wrong thereafter. And there is no fraudulent concealment exception to the contemporaneous ownership requirement for asserting corporate derivative claims.
1. Count V — Transfer of Shares to Chris Mirra and Natalie Wright
1.1. Undisputed Material Facts
Norino Mirra, Sr., founded the Mirra Co., Inc., in 1953. At first he was the sole owner of the Company. Over time Norino Sr. transferred a 20 percent ownership interest to his nephew Antonio Mirra. At some point thereafter, before 2001, Norino Sr. transferred his remaining 80 percent interest to his sons Norino and Ralph, giving each half. In January 2005 Antonio transferred his 20 percent interest to his children Lenny, Sandra, and Anthony, giving each one-third of his stock or a 6.666 percent interest in the Company.
Around the same time that Antonio transferred his stock to his children, the five resulting Company owners — Norino, Ralph, Lenny, Sandra, and Anthony — entered into a “Corporate Stock Redemption Agreement” to govern future ownership of Company stock. This contract recites that there were a total of 100 shares of Company stock at the time the contract was executed, that Norino and Ralph each owned 40 shares, and that Lenny, Sandra, and Anthony each owned 6.666 shares. It also recites that the parties intended “that ownership of stock in the Corporation remain in and be restricted to the parties hereto.” Section 1 of this Redemption Agreement provides that “[u]pon the death of a Stockholder, the Corporation shall purchase and the personal representative of the deceased Stockholder shall sell to the Corporation” all of the stockholder’s shares in the Company, at the price and on the terms spelled out later in the contract. Section 3 provides that “[t]he certificate or certificates of stock subject to this Agreement shall not be assigned or otherwise disposed of during the continuance of this Agreement except as herein provided.” It also required that each stock certificate contain an endorsement stating that the certificate “and any disposition of it are subject to the terms of an Agreement
When Ralph died in 2014, the Company repurchased Ralph’s shares as provided in the Redemption Agreement. That left 60 shares of stock outstanding. As a result, Norino now owned 66.67 percent of the Company (40 of 60 remaining shares), and Lenny, Sandra, and Anthony each owned 11.11 percent (6.666 of 60 shares).
In January 2015, Norino caused the Company to issue new stock and distribute a “stock dividend” of three' new shares for each existing share. In other words, the Company issued 180 new shares of stock and distributed them in proportion to the then-existing ownership of the 60 shares that remained of the original stock. As a result, Norino now owned 160 shares of stock in the Company and Lenny, Sandra, and Anthony each owned 26.666 shares.
A few weeks later Norino transferred his 120 new shares to his children Chris and Natalie. After this transfer Norino retained 40 shares of Company stock (a 16.67 percent interest), Chris and Natalie owned 60 shares each (25.0 percent interests), and Lenny, Sandra, and Anthony owned 26.666 shares each (11.11 percent interests).
1.2. Construing the Redemption Agreement
Lenny and Sandra claim that Norino violated the Redemption Agreement when he transferred his new shares of stock to his children in Januaiy 2015. They seek a declaration that these transfers are null and void and that Chris and Natalie are not stockholders of the Company.[1]
The parties disagree about the proper interpretation of the first sentence of Section 3 of the Redemption Agreement, which provides that “(t]he certificate or certificates of stock subject to this Agreement shall not be assigned or otherwise disposed of during the continuance of this Agreement except as herein provided.” Chris and Natalie argue that the phrase “certificates of stock subject to this Agreement” refers only to the original 100 shares of Company stock that are discussed in the first “Whereas” clause of the contract, and thus that Section 3 did not bar the transfer or other disposition of new shares" issued after the Redemption Agreement was executed. Lenny and Sandra argue that any and all shares of Company stock are subject to the Redemption Agreement, even if new shares are issued later, and that therefore Section 3 barred Norino from transferring his new shares to his children. The Court concludes that this latter interpretation is the correct one, and that as a result the transfer of Norino’s new shares to Chris and Natalie is voidable.
The usual rules of contract interpretation apply. ‘The words of a contract must be considered in the context of the entire contract rather than in isolation . . . When the words of a contract are clear, they must *43 be construed in their usual and ordinary sense[.]” General Convention of the New Jerusalem in the United States of Am. Inc. v. MacKenzie, 449 Mass. 832, 835 (2007) (citations omitted).
Since the Court concludes that the contested contract provision is unambiguous, it may decide the issue on a motion for summary judgment. “If a contract ... is unambiguous, its interpretation is a question of law that is appropriate for a judge to decide on summary judgment.” Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002). “Whether a contract is ambiguous is also a question of law.” Eigerman v. Putnam Investments, Inc., 450 Mass. 281, 287 (2007). The fact that the parties disagree sharply as to the scope of the stock transfer restriction does not mean that the contract is unclear. “[A]mbiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other’s.” Indus Partners, LLC v. Intelligroup, Inc., 77 Mass.App.Ct. 793, 795 (2010) (affirming summary judgment based on contract interpretation), quoting Jefferson Ins. Co. v. Holyoke, 23 Mass.App.Ct. 472, 475 (1987).
When read in the context of the Redemption Agreement as a whole, the provision restricting stock transfers unambiguously applies to all shares of stock in the Company, not merely to the 100 shares that were outstanding at the time the Redemption Agreement was executed. Section 3 provides in relevant part that stock certificates “subject to this Agreement may not be assigned or transferred "except as herein provided." Section 1 provides that when a stockholder dies “all of the stock in the Corporation owned by the deceased Stockholder” must be sold to and purchased by the Company. The phrase “all of the stock” means what it says; it encompasses all Company stock, including shares issued in the future. Since Section 1 makes clear that all Company stock is subject to the Redemption Agreement, the only reasonable way to construe the first sentence of Section 3 is as restricting the transfer or other disposition of all Company stock, including any new stock issued after the Agreement was executed.
This reading of the Redemption Agreement is consistent with the third “whereas” clause, which expressly states the shared intent of the parties “that ownership of stock in the Corporation remain in and be restricted to the parties hereto,” which were the five individuals who owned stock in the Company as of January 2005. The Court must construe the Redemption Agreement as a whole in a manner that will “give it effect as a rational business instrument and . . . carry out the intent of the parties.” Robert and Ardis James Foundation v. Meyers, 474 Mass. 181, 188 (2016), quoting Starr v. Fordham, 420 Mass. 178, 192 (1995). It is appropriate to consider statements of intent and other recitals in “whereas” clauses as an aid to construing the substantive provisions of a written contract, even where the contract addresses stock redemptions and transfer restrictions. Standard Box Co. v. Winchester Carton Corp., 343 Mass. 572, 582 (1962) (patent dispute settlement agreement); Winchell v. Plywood Corp., 324 Mass. 171, 180-81 (1949) (stock redemption and transfer restriction agreement); see generally Nassif v. Boston & M.R.R., 340 Mass. 557, 563 (1960) (“the recitals of the preamble may be used to assist in interpreting other parts of the contract”).
The principle “that stock transfer restrictions are to be construed narrowly” does not compel a different result. Cf. Merriam v. Demoulas Super Markets, Inc., 464 Mass. 721, 730 (2013). Lenny and Sandra are not trying to expand the scope of Section 3 by applying it to uncovered transactions or individuals. Contrast Durkee v. Durkee-Mower, Inc., 384 Mass. 628, 633-34 (1981) (restriction on “selling” stock shares without first offering them to corporation did not apply to assignment ordered by Probate Court in divorce decree); Brown v. Little, Brown & Co., 269 Mass. 102, 112-14 (1929) (stock restriction requiring employee who “shall retire” to sell stock back to corporation did not apply to employee who was discharged involuntarily). A stock transfer restriction, like any contract, must be construed in accord with the ordinary meaning of the contractual language. Durkee, supra, at 632-33. As explained above, since the Redemption Agreement as a whole expressly applies to “all of the stock in the Corporation,” the stock transfer restriction does as well.
In sum, the relevant provision of the Redemption Agreement unambiguously barred the transfer of Norino’s new stock in the Company to Chris and Natalie. Lenny and Sandra are entitled to judgment in their favor on Count V even though they did not file a cross motion for summary judgment. See Mass.R.Civ.P. 56(c) (“Summary judgment, when appropriate, may be rendered against the moving party”); Targus Group Intern., Inc. v. Sherman, 76 Mass.App.Ct. 421, 422 n.2 & 428-34 (2010) (affirming summary judgment in favor of non-moving plaintiff on breach of contract claim based on court’s interpretation of written agreement). The Court will therefore order the declaratory relief be entered in favor of Lenny and Sandra on Count V.
2. Count VI — Derivative Claim against Norino Mirra
2.1. Undisputed Material Facts
In 1988 Norino and Ralph inherited 22 acres of land from their father, Norino Sr. This property was located across the street from the Company’s headquarters in Georgetown, Massachusetts. Norino and Ralph decided to build a large apartment complex on this property. That project became known as “Longview at Georgetown.” Construction of the Longview apartments began in 2000 and was completed in 2004; the Town of Georgetown issued occupancy permits for the various buildings that comprise Longview between *44 June 10, 2004, and the end of November 2004.[2] Longview included affordable housing and was developed under G.L.c. 40B. This was the first time that Norino and Ralph had ever developed a c. 40B project. When completed, Longview contained 186 apartments in seven different buildings.
In 2001 Norino and Ralph transferred ownership of the 22-acre parcel to a separate limited liability company that the parties call “San Giorgio.”[3] Norino and Ralph established San Giorgio so that they would be the sole owners of Longview and the sole beneficiaries of the profits and fees to be derived from Longview. They never offered Mirra Co. or any other shareholder of Mirra Co. an opportunity to participate in San Giorgio or to share in its profits.
Lenny and his father Antonio knewbefore 2005 that Longview was being built, that it was owned by Normo and Ralph, and that neither the Company, nor Antonio, nor Lenny and his siblings had any interest in or owned any share of Longview. Antonio knew that Company employees and crews were working on the Longview project and observed them doing so. The Longview apartments were built within plain view of the Company’s headquarters. One could see the Long-view construction out of the Company’s windows.
The Company did all the site work for the Longview project and a different contractor, Plumb House, built the buildings. San Giorgio closed on its construction financing in June 2003.- By that point in time -the Company had incurred and paid over $1.1 million in development fees and expenses for the Longview project. After the loan closing, but before the end of 2004, the Company incurred in excess of $500,000 in additional expenses related to Longview.
Norino and Ralph identified the Company as the “developer” of Longview in various filings and in contracts with outside consultants and professions. The Company also identified itself as the “developer” of the project in contracts that it executed with outside consultants and professionals that worked on Long-view. The Company performed development work on and incurred development expenses in connection with the Longview project without any written security agreement or guarantee of repayment from Norino, Ralph, or any entity controlled by them.
As part of the permitting process for Longview, in July 2001 Norino and Ralph filed pro forma financials with the Town of Georgetown that included a $4.9 million “development fee” in the project budget. The final cost certification for the project indicates that as of December 9, 2004, a “developer’s fee” of $4.7 was still owed.
San Giorgio paid the Company a total of $4,566,567 for its work on the Longview project. It reimbursed the Company for its labor and material costs and for all amounts that the Company paid to subcontractors for their work on Longview. But San Giorgio never paid the Company any profit margin and did not pay for the use of equipment owned by the Company. Nor did San Giorgio ever pay the Company any kind of developer’s fee.
During construction .and development of Longview, neither Norino nor Ralph ever informed Antonio or his children that the Company was acting as the developer of the project, was incurring development expenses on behalf of Longview, or was owed a development fee for its role in the project. Antonio and his children were never provided with any of the Longview contracts, invoices, or financial statements before 2014. They understood that the Company would be repaid for its site work on the Longview property on the same basis as with any arms-length contract under which the Company provided similar services.
2.2. Standing under G.L.c. 156D, §7.41
In their derivative claim, Lenny and Sandra claim that Norino breached his fiduciary duty to the Company and should be required to pay compensatory damages. This claim has three parts. First, Plaintiffs claim that the Longview project should have been a corporate opportunity owned by the Company but that Norino and Ralph usurped it for themselves. Second, they claim that the Company should have been paid more for the site work it performed and the expenses it incurred on the Longview project. Third, they also claim that, in addition, San Giorgi should have paid the Company a “developer’s fee” of approximately $4.7 million to compensate the Company for the risks it assumed and the value it added to the Longview project as the de facto developer of the project.
Lenny and Sandra do not have standing to assert these derivative claims on behalf of the Company. These claims are based on acts or omissions that occurred before Lenny and Sandra acquired any stock in the Company. The Massachusetts Business Corporation Act provides that “[a] shareholder may not commence or maintain a derivative proceeding unless the shareholder . . . was a shareholder of the corporation at the time of the act or omission complained of[.]” G.L.c. 156D, §7.14; accord Mass.R.Civ.P. 23.1.[4] This is known as the “contemporaneous ownership requirement.” Billings v. GTFM, LLC, 449 Mass. 281, 291 n.21 (2007). Lenny and Sandra acquired their Company stock in January 2005. Any usurpation of Longview as a corporate opportunity happened well before the project was completed in 2004, when Norino and Ralph transferred ownership of the properly to a separate entity owned only by them. With respect to the alleged failures to pay the Company an appropriate amount for the site work or to pay an additional developer’s fee, Plaintiffs assert (in their post-hearing letter) that the breach they complain of “is the failure of Norino to collect the fees due to Miira Co. after they were earned.” But Plaintiffs’ own experts opine that those claimed fees were earned no later than December 2004. That is consistent with the undisputed evidence, discussed above, that the Longview project *45 was completed no later than November 2004. Since the claimed debts were owed to the Company before Lenny and Sandra became stockholders, and thus Norino’s alleged failure to collect those debts also occurred before that time, Lenny and Sandra lack standing to prosecute these derivative claims.
Courts in jurisdictions with similar derivative action statutes “have recognized an exception to the contemporaneous ownership requirement where there has been a ‘continuing wrong.’ ” Blasband v. Rales, 971 F.2d 1034, 1045 (3d Cir. 1992) (applying Delaware law), quoting Schreiber v. R.G. Bryan, 396 A.2d 512, 516 (Del.Ch. 1978). “(I]f, in a derivative action, the wrong complained of is a continuing one and has not been consummated, a transferee of stock may sue although the wrong commenced before the transfer.” Newkirk v. W.J. Rainey, Inc., 76 A.2d 121, 123 (Del.Ch. 1950); accord, e.g., Bateson v. Magna Oil Corp., 414 F.2d 128, 130 (5th Cir. 1969) (applying Fed.R.Civ.P. 23.1) (“the requirement that a shareholder must have owned stock at the time of the wrong of which he complains may be satisfied if the wrong is a continuing one; that is, if it ‘spans the plaintiffs ownership, or if new elements in a pattern of wrongful conduct occur after acquisition’ ”) (quoting Prunty, Business Associations, 35 N.Y.U.L.Rev. 1468 (1960)).
It makes sense to read the Massachusetts Business Corporation Act the same way. If a corporate fiduciary’s alleged malfeasance consists of a series of acts or omissions that began before but continues after a particular shareholder acquires its stock, then that shareholder would have owned stock at the time of the alleged malfeasance within the meaning of G.L.c. 156D, §7.14. The “continuing wrong” concept under derivative action statutes is analogous to the “continuing violation” principle that the Supreme Judicial Court has discerned in G.L.c. 151B with respect to unlawful employment discrimination. Crocker v. Townsend Oil Co., Inc., 464 Mass. 1, 10-11 (2012) (“in certain discrimination cases arising under G.L.c. 15 IB, §4, we have held that the continuing violation doctrine permits plaintiffs to recover for damages occurring outside the limitations period as long as ‘there is a discrete violation within the [statute of] limitations period to anchor the earlier claims’ ”) (quoting Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 532 (2001)). Since Massachusetts law recognizes the continuing violation doctrine with respect to certain kinds of ongoing workplace discrimination, it makes sense to follow the similar continuing wrong doctrine when applying the derivative action provision of the Business Corporation Act.[5]
The “continuing wrong” doctrine does not save Plaintiffs’ derivative claims however. “(B]ecause every wrongful transaction may be viewed as a continuing wrong to the corporation until remedied, . . . the ‘test to be applied in such situations concerns whether the wrong complained of is in actuality a continuing one or is one which has been consummated . . . [W]hat must be decided is when the specific acts of alleged wrongdoing occur, and not when their effect is felt.’ ” Blasband, 971 F.2d at 1046, quoting Schreiber, 396 A.2d at 516. The alleged wrongdoing in this case was the failure to pay the Company the additional amounts that Plaintiffs assert were due for the Company’s work and role on the Longview project. That alleged wrongdoing occurred when the payment obligation first arose. Cf. Crocker, 464 Mass, at 10-11 (tortious failure to pay wages occurs when wages were first due, and does not constitute a “continuing violation”). The continuing wrong exception to the contemporaneous ownership requirement does not apply where a corporation was owed money before the plaintiff acquired stock in the company, even if the debt remains uncollected after the plaintiff first acquired stock. Midland Food Services, LLC v. Castle Hill Holdings V, LLC, 792 A.2d 920, 932 (Del.Ch. 1999), aff'd, 782 A.2d 265 (Del. 2001); White v. Philips, 58 N.Y.S.2d 52 (N.Y.Sup.Ct. 1945). Thus, Plaintiffs may not invoke the continuing wrong doctrine merely because Norino’s alleged failure to collect monies owed to the Company before 2005 was not remedied thereafter.
Nor can Plaintiffs circumvent the contemporaneous ownership requirement by asserting, as they do, that Normo fraudulently concealed the alleged breaches of fiduciary duty that underlie the derivative claims. The notion of fraudulent concealment is relevant when applying statutes of limitations but is not relevant here. The fraudulent concealment of a cause of action will toll a statutory limitations period that does not begin running until the cause of action accrues, because a cause of action does not accrue until a party discovers or, in tort cases not involving breach of fiduciary duty, reasonably should have discovered that they have been injured.[6] But the fraudulent concealment doctrine has no application to a statute of repose that starts to run when an allegedly wrongful act or omission occurs, or to any other kind of statute that restricts the bringing of an action based on the time that a wrong or other event occurs or a cause of action arises. See Joslyn v. Chang, 445 Mass. 344, 345-47 (2005) (statute of repose that bars medical malpractice claims brought “more than seven years after occurrence of the act or omission which is the alleged cause of the injury”) (quoting G.L.c. 260, §4); Sullivan v. Iantosca, 409 Mass. 796, 797 n.2 & 798 (1991) (statute of repose that bars negligent design claim brought “more than six years after the earlier of the dates of: (1) the opening of the improvement to use; or (2) substantial completion of the improvement and the taking of possession for occupancy by the owner”) (quoting G.L.c. 260, §2B); Doe No. 4 v. Levine, 77 Mass.App.Ct. 117, 118 & 120 n. 12 (2010) (statute that limits tort liability of corporation that was a charity “at the time the cause of action arose”) (quoting G.L.c. 231, §85K). Similarly, the requirement that derivative action plaintiffs must have been shareholders “at the *46 time of the action or omission complained of does not turn on when a cause of action was discovered, should have been discovered, or otherwise accrues. See G.L.c. 156D, §7.41(1). The fraudulent concealment doctrine therefore does not apply to the contemporaneous ownership requirement either.
ORDER
The motion by Christopher Mirra and Natalie Wright for summaiy judgment as to Count V of the second amended complaint is DENIED. When final judgment enters in this case, it shall include a declaration that the transfers by Norino Mirra of shares in the Mirra Co., Inc., to Christopher Mirra and Natalie Wright were made in violation of the Corporate Stock Redemption Agreement that was executed by the Company’s shareholders in January 2005, that those transfers are null and void, and that Christopher Mirra and Natalie Wright are not stockholders of the Mirra Co., Inc.
The motion by Norino Mirra for summaiy judgment as to Count VI is ALLOWED. When final judgment enters this claim shall be dismissed with prejudice.
A final pre-trial conference will be held on March 14, 2017, at 2:00 p.m.

 Plaintiffs named their brother Anthony as a defendant solely because, as another minority shareholder of the Company, he is a necessary party -with respect to this claim for declaratory relief.

 Although Plaintiffs assert “[u]pon information and belief’ that construction work on Longview was not completed until 2006, that assertion is not supported by any admissible evidence and thus must be “disregarded.” See Billings v. GTFM, LLC, 449 Mass. 281, 295 (2007) (“ ‘All affidavits or portions thereof made on information and belief, as opposed to personal knowledge, are to be disregarded in considering a motion for summaiy judgment,’ because they constitute inadmissible hearsay”) (quoting Shapiro Equip. Corp. v. Morris & Son Constr. Corp., 369 Mass. 968, 968 (1976). A verified complaint is “treated as an affidavit for purposes of summary judgment” only to the extent that “it contains specific facts that the signer knows to be true.” Pupecki v. James Madison Corp., 376 Mass. 212, 217 (1978).

 This company was originally called San Giorgio I, LLC. It later changed its name to Longview Apartments at Georgetown, LLC.

 A shareholder may also bring a derivative action if they or it “became a shareholder through transfer by operation of law from one who was a shareholder” at the time of the allegedly wrongful act or omission. Id. Plaintiffs do not claim that the transfer of stock from their father to them was a “transfer by operation of law.”

 But see In re Facebook, Inc., Initial Public Offering Derivative Litigation, 797 F.3d 148, 160 (2d Cir. 2015) (noting that Second Circuit has declined to read continuing wrong doctrine into Fed.R.Civ.P. 23.1, and instead holds that “in order to invoke derivative standing ... a plaintiff must have owned stock in the corporation throughout the course of the activities that constitute the primary basis of the complaint" (emphasis in original)) (quoting In re Bank of N.Y. Derivative Litig., 320 F.3d 291, 298 (2d Cir. 2003)).

 See generally G.L.c. 260, §12; Aiello v. Aiello, 447 Mass. 388, 404 n.25 (2006) (describing application of fraudulent concealment doctrine to derivative suit brought on behalf of corporation); Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 517-22 (1997) (applying doctrine to claim for breach of fiduciary duty).